## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT

Your affiant, Cameron Anders, Task Force Officer with the Immigration and Customs Enforcement, Homeland Security Investigations, being duly sworn, deposes and states:

## INTRODUCTION AND AGENT BACKGROUND

1) I am a Task Force Officer with Homeland Security Investigations (HSI), Office of the Assistant Special Agent in Charge (ASAC), Douglas, Arizona.  I have been employed as a Task Force Officer (TFO) with HSI since May of 2021.  I am currently assigned to the Narcotics group based in Douglas, Arizona.  I completed the United States Border Patrol (USBP) Academy in 2009 and worked as a United States Border Patrol Agent (BPA) until 2013.  I completed the United States Customs and Border Protection (CBP) Office of Field Operations (OFO) Academy in 2015. I completed the HSI TFO Course in August 2021.  During my ten-year career in law enforcement I have taken part in numerous investigations of individuals who have violated state and federal laws, particularly laws found in Title 8 (human smuggling/trafficking), Title 21 (controlled substance violations), and Title 22 (illegal import and export of weapons) of the United States Code.  I have conducted physical and electronic surveillance, am familiar with counter-surveillance tactics, have executed search warrants, reviewed documents of narcotic and human smugglers, and interviewed and debriefed confidential sources of information and cooperating defendants regarding the function of human smuggling, weapons trafficking, and drug trafficking organizations.

2) Through my experience, I know that persons involved in narcotics, human, and firearms smuggling utilize fictitious names, fictitious addresses, and straw persons to register residences, vehicles, utilities, and cellular telephone numbers to conceal their identity, avoid detection by law enforcement, and prevent being tied to their illicit activities.

3) The statements contained in this affidavit are based on information provided by fellow HSI Agents and Task Force Officers and on my experience as a Task Force Officer with HSI. Since this affidavit is submitted for the limited purpose of securing a search warrant, I have not included all facts known to me regarding this investigation. I have set forth facts that establish probable cause to believe that the suspect referred to in this affidavit violated § 22 U.S.C. 2778(b) and § 18 U.S.C. 554(a). This affidavit is intended to show only that there exists sufficient probable cause for the requested warrant and does not portray all of my knowledge about this matter.

4) I am familiar with 22 U.S.C. §§ 2778(a) and (b), which establish federal guidelines for the import and export of arms. Included in 22 U.S.C. § 2778(b)(1), the President is authorized to designate items which shall be considered as defense articles and defense services and establishes regulations for the import and export of such articles. The items designated constitute the United States Munitions List.

a. Listed in the United States Munitions List under Category XIII - Materials and Miscellaneous Articles, Section (e), are armor and armor materials, non-transparent ceramic plate or blanks, greater than 1/4 inches thick and larger than 8 inches × 8 inches for transparent armor. Further listed within the United States Munitions List under Category XIII - Materials and Miscellaneous Articles, Section (e), is composite armor meeting or exceeding the National Institute of Justice (NIJ) Level III certification and metal laminate armor meeting or exceeding NIJ Level III. These items contained within the United States Munitions List under Category XIII are prohibited from export without proper registration by the exporter, as set forth in 22 U.S.C. § 2778 (b)(1)(A)(i).

b. 22 U.S.C. § 2778 (b)(1)(A)(i) states that every person (other than an officer or employee of the United States Government acting in an official capacity) who engages in exporting any defense articles designated by the President shall register with the United States Government.

5) I am also familiar with 18 U.S.C. § 554(a), which states whoever fraudulently or knowingly attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined, imprisoned not more than 10 years, or both.

6) Based on my background, training, and experience, I know that individuals who are involved in firearms and defense article smuggling often do the following:

a. Use cellular telephones to arrange, coordinate, and monitor criminal activities including communicating with other smugglers, coordinators, and scouts/lookouts. They also use these devices to communicate with these same individuals during counter surveillance activities, to warn other co-conspirators of the presence of law enforcement or other obstacles to their criminal plans;

b. Use cellular telephones to facilitate the receipt of monies for payment for their role in the scheme, and to contact individuals who sell/rent real estate, vehicles, hotel rooms, restaurants or other facilities that firearms smugglers and defense article smugglers use in the course of their illegal activities;

c. Use many or all the communication technologies available within the particular cellular telephone, including voice messaging, texting, audio communication, direct dial, push-to-talk, emailing, internet access, speed dial, photo and video images, and contact lists containing contact information for their criminal associates to accomplish their criminal activities;

d. Use multiple cellular telephones and often change cellular telephones to avoid detection by law enforcement;

e. Use cellular telephones to store and maintain contact lists containing the names, nicknames, telephone numbers, e-mail addresses and social media profile identifiers of other criminal associates; communicate with other criminal associates by voice, e-mail and text message, including through Apple iMessage and FaceTime, as well as third-party applications such as WhatsApp, Facebook Messenger, Instagram, Snapchat, and BlackBerry Messenger; record, store and share with other criminal associates, including through the use of third-party applications, photographs, videos and other evidence of illicit activity such as photographs of vehicles to ensure that the criminal associates find other vehicles that they are supposed to be utilizing or coordinating with; and to utilize all available Global Positioning System (GPS) functions, including navigation and mapping, which GPS data then may be recorded and stored.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7) The property sought to be searched consists of one cellular telephone.  The cellular telephone to be examined will be referred to herein as the target phone.  The target phone is a black iPhone cellular telephone, seized from Michael JACOBO on September 13, 2021.  The target phone is stored in the HSI ASAC office in Douglas, Arizona, located at 2334 AZ-80, Douglas, AZ 85607, and is sealed inside of a Department of Homeland Security evidence bag with signed Form 6051S (Custody Receipt for Seized Property and Evidence).

8) The requested warrant would authorize the forensic examination of target phone for the purpose of identifying electronically stored data particularly described in Attachment B (incorporated herein by reference).

## PROBABLE CAUSE

9) On or about September 13, 2021, at approximately 1:20 pm, Customs and Border Protection Officers (CBPOs) at the Raul H. Castro Port of Entry in Douglas, Arizona, conducted outbound inspections of a vehicle driven by Michael JACOBO as he attempted to exit the United Stated into Mexico. JACOBO was accompanied by passenger Alik ESPINOZA. During outbound inspection CBPOs found two ballistic armor plates and one tactical armor carrier hidden within the vehicle, a Ford Explorer. During inspection, JACOBO gave a negative declaration to bringing any firearms, firearms parts, ammunition, or any money in or exceeding the value of $10,000 (U.S. dollars). During a post-*Miranda* custodial interview, ESPINOZA stated she and JACOBO communicated and coordinated the smuggling attempt via cellular telephone. During a post-*Miranda* custodial interview, JACOBO stated he and ESPINOZA communicated via telephone in relation to coordinating a ride which occurred during the smuggling attempt. JACOBO immediately retracted that statement. JACOBO further stated that he had "been jammed up by Homeland Security" before and "wasn't stupid enough" to utilize his phone for illegal activities.

10) The items found in JACOBO and ESPINOZA's possession were found on a publicly accessible website, by performing an internet search of the manufacturer's/seller's name as marked on the items (https://armrunlmtd.com/products/steel-10x12), and are described as "Level III single-curve shooter's cut front plate and flat shooter's cut back plate, AR500 steel construction, anti-corrosive finish, light weight at approximately 8 pounds per plate." These articles, by definition of the manufacturer/seller, are items contained within the United States Munitions List under Category XIII.

11) In my experience in conducting investigations of smuggling through the ports of entry, regardless of a smuggler's intended destination, I have learned that it is common for smugglers to use

cellular telephones to arrange, coordinate, and monitor smuggling activities. Traffickers will typically rely on cellular communications to find out the location of the final destination of their smuggling activities. Traffickers will receive addresses, directions, names, and contact information for where and who will be accepting delivery of their illicit goods. Traffickers are also known to use multiple cellular devices due to the difference in cellular carriers in Mexico and in the United States. These electronic devices often contain electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and other files and can be helpful in identifying other members of the smuggling conspiracy. In addition to being evidence of a crime, in cases of this sort, there is probable cause to believe that the cellular telephone device was used as a means of committing offenses involving the transportation of defense articles in violation of law and the contents within the cellular telephone should be seized and searched on that basis alone.

12) During previous interviews with other drivers of illicit goods at the ports of entry in southern Arizona, I have learned that drivers will be required to give confirmation to coordinators in the United States and Mexico of a successful border crossing. Drivers will also typically have to be contacted after a successful border crossing to learn instructions for delivering the illicit goods. Contact information for coordinators, scouts, and stash house operators are typically stored in the cellular devices carried by the drivers. Based on the statements by ESPINOZA, a co-conspirator, that she and JACOBO utilized their cellular telephones to coordinate the smuggling attempt, JACOBO likely utilized his cellular telephone to communicate with other co-conspirators to coordinate the smuggling attempt. Based on the likelihood that JACOBO would have had to receive instructions on where to pick up and to deliver the ballistic armor plates and tactical armor carrier, and having no

other means of communication besides the cellular telephone that was in his possession at the time of his detention, I believe that target phone was used to facilitate this smuggling event.

13) Since the date of arrest, the target phone has been in storage at the location described in paragraph 7.  The target phone has been stored in such a manner that its contents, to the best of my knowledge, are in substantially the same state as when it first came into possession of Homeland Security Investigations.

## **TECHNICAL TERMS**

14)  Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional land line telephones. A wireless telephone usually contains a call log, which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic address books; sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and

downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

15) Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate

reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

16) Portable media player. A portable media player (or MP3 Player or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games. Most cell phones currently manufactured contain portable media players as a standard feature.

17) Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

18) Based on my training, experience, research, and from consulting the manufacturer's advertisements and product technical specifications available online for these types of cellular telephones, and based upon my discussions with experts, I know that the cellular telephones which

are the subject of this search warrant application most likely have capabilities that allow them to also serve as a radio communication transmitter, wireless telephone, GPS device, wireless internet connectivity, and text message capabilities, as these are generally standard features. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19) Based on my knowledge, training, and experience, I know that electronic devices such as the target phone in this case can store information for long periods of time.  Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on such devices. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person deletes the information on an electronic device, the data does not actually disappear; rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

20) As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the requested search warrant, but also forensic evidence that establishes how the target

phone was used, where it was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be on the target phone because:

   a. Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

   b. Forensic evidence on a device can also indicate who has used or controlled the devices. This user attribution evidence is analogous to the search for indicia of occupancy while executing a search warrant at a residence.

   c. A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the search warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when and where it was used, sometimes it is necessary to establish that a particular thing is not present on a storage medium; for example, the absence of the entry of a name in a contact list as evidence that the user(s) of the target phone did not have a relationship with the party.

   f. The examination of the target phone may require authorities to employ techniques including computer-assisted scans of the entire medium that might expose many parts of the device

to human inspection in order to determine whether it is evidence described by the search warrant. Because this application only seeks permission to examine a device already in the possession of Homeland Security Investigations, the execution of the requested search warrant does not involve the physical intrusion onto a premises. Consequently, I request that the Court authorize execution of the warrant at any time in the day or night.

## CONCLUSION

21) I submit that this affidavit establishes probable cause for a search warrant authorizing the examination of the target phone, further described in Attachment A, and to seek the items described in Attachment B. I believe that the target phone contains evidence relating to the commission of a criminal offense; specifically, violations of Title 22, United States Code, Section 2778(b), and Title 18, United States Code, § 554(a); and constitutes property designed for use, intended for use, or used in committing the aforementioned crime.

CAMERON S ANDERS
Digitally signed by CAMERON S ANDERS
Date: 2021.10.05 13:10:58 -07'00'

Cameron Anders, Task Force Officer
Homeland Security Investigations

Subscribed and sworn to me telephonically
This __6th__ day of October, 2021:

*Maria S. Aguilera*
Honorable Maria S. Aguilera
United States Magistrate Judge
District of Arizona